IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 5, 2018 Session

**STATE OF TENNESSEE v. FELIPE GONZALES**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04518       Lee V. Coffee, Judge**

_____

**No. W2017-00941-CCA-R3-CD**

_____

The Appellant, Felipe Gonzales, was convicted in the Shelby County Criminal Court of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony, and received an effective fifty-year sentence to be served at 100%.  On appeal, the Appellant contends that the trial court erred by failing to suppress his statement to police, that the trial court erred by not allowing him to cross-examine witnesses about possible bias, that the trial court erred by not instructing the jury on attempt as a lesser-included offense of rape of a child, that his convictions violate double jeopardy, and that the evidence is insufficient to support the convictions.  Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Harry E. Sayle, III (on appeal), and Jennifer H. Case (at trial), Memphis, Tennessee, for the appellant, Felipe Gonzales.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Lee Calhoun Rainey and Jeffrey D. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the Appellant's sexually abusing his great niece.  In September 2013, the Shelby County Grand Jury indicted the Appellant for rape of a child and

aggravated sexual battery. The indictment alleged that the crimes occurred between January 4 and January 8, 2013.

At the Appellant's February 2017 trial, the victim's mother testified through an interpreter that she was from Honduras and did not speak English. In January 2013, she lived in a house on Toehill Cove with her husband; her two sons, who were twelve years old and ten months old; and the victim, who was seven years old. At some point, the Appellant, who was the victim's mother's uncle, came to live with the family. The children slept in one bedroom with the victim sleeping on the bottom bunk of a bunk bed and the victim's older brother sleeping on the top bunk.

The victim's mother testified that she worked at the El Rodeo bar and that her shift was from 9:00 p.m. until 3:00 a.m. On the night in question, a Saturday, she went to work and left the children at home with her husband and the Appellant. At 3:00 a.m. on Sunday morning, her husband picked her up from work. When the victim's mother and her husband arrived home and went inside, the victim's mother saw the Appellant coming out of the victim's bedroom, which she thought was "not normal." She then saw the victim go into the bathroom. The victim's mother followed the victim into the bathroom and asked her why the Appellant had been in her room. The victim did not want to tell her mother, so her mother told her, "[D]on't be afraid, I'm not going to do anything to you." The victim told her mother that the Appellant "was touching her." The victim's mother asked where, and the victim pointed to her genital area. The victim was scared, so the victim's mother put the victim in bed with her.

The victim's mother testified that later Sunday morning, she asked the Appellant if he remembered what he had done, and he said no. The victim's mother knew he had been drinking alcohol on Saturday night. She told the Appellant that the victim had said the Appellant touched her and that the victim would not lie. The Appellant told the victim's mother that he wanted to go back to Honduras, and she asked him, "Why[?] Why would you want to leave for Honduras? The fact that what you have done, would that make you go[?]" She told the Appellant that he could no longer live with her family.

The victim's mother testified that she later made "some comments" about the incident to her friend, Esperanza Sanchez. On Monday night, the victim's mother's youngest son swallowed a coin, so she took him to the hospital where he stayed for two days. While she was at the hospital with him, her sister took care of the victim and the victim's older brother. At some point, her sister telephoned her and talked with her about what had happened between the Appellant and the victim. When the victim's mother got home from the hospital, she took the victim to a clinic for a forensic examination. She also gave a statement to police. She said she did not talk with the victim about the

incident again because the victim "could not speak about this subject" and "was not well."

On cross-examination, the victim's mother acknowledged that her husband also saw the Appellant come out of the victim's bedroom. She said she did not call the police because the victim said the Appellant touched her but "did not mention about all the things, the other things, that he had done to her." Her husband also did not call the police. She stated, "My husband wanted to beat him up, but I did not let him." She said that at the time of the incident, the Appellant had been living with her family about one and one-half months and that he was working as a house painter. She acknowledged that after she confronted the Appellant on Sunday morning, he asked the victim if it was true that he had touched her. The victim said yes, and the Appellant said he did not remember.

The victim's aunt, who also was the victim's mother's twin sister, testified through an interpreter that in January 2013, her youngest nephew swallowed a coin. While he was in the hospital, she kept her sister's two older children. The victim's aunt talked with Esperanza Sanchez, and Sanchez told the victim's aunt about the incident between the Appellant and the victim. When the victim's aunt picked up the victim after school, the victim's aunt told the victim that she wanted to talk with the victim about what had happened between the victim and the Appellant. The victim became nervous and started crying. The victim told her aunt that "she was sleeping in her bedroom and that [the Appellant] entered into the bedroom and he started touching her. He kissed her and he performed oral sex." The victim's aunt telephoned the victim's mother and asked "if she knew about all of this." The victim's mother said no. The victim's aunt telephoned the police, and an officer came to her house to take a report. The officer transported the victim and her aunt to the Rape Crisis Center, but a forensic examination was not performed on the victim that night because a physician was not available. The victim's mother later took the victim back to the Center for an examination.

On cross-examination, the victim's aunt testified that she had not talked with the victim's mother about the incident in the past four years because it had had "an effect" on the victim's mother. She said she attended meetings with the victim and the prosecutor before trial in order to prepare for their testimony. On redirect examination, the victim's aunt testified that the prosecutor told her to tell the truth.

Teresa Onry testified that she was a forensic interviewer at the Child Advocacy Center (CAC), which she described as "a child-friendly place where children come to talk about allegations of either sexual or severe physical or neglect abuse." Onry conducted a video-recorded forensic interview of the victim on January 28, 2013.

- 3 -

The State played the interview for the jury. During the interview, Onry showed the victim drawings of a naked girl and a naked boy, and the victim identified the girl's genitalia as a "girl's thing" and the boy's genitalia as a "man's thing." Onry asked the victim if someone had touched her "girl's thing," and the victim answered, "My uncle . . . Felipe Gonzales." Onry asked the victim to tell her about the incident, and the victim said the Appellant was "drunk" and "kissing me." The victim said she was asleep in her bed and awoke to the Appellant's touching her girl's thing inside her clothes. He pulled down her underwear and touched the outside of her girl's thing with his mouth. He then put his man's thing on her girl's thing. The victim said that she was lying on the bed and that the Appellant was on his knees on the floor. Onry asked if the Appellant put his man's thing on the outside or the inside of her girl's thing, and the victim said he moved her from the bed onto the floor and put his man's thing inside her girl's thing. She said she did not see his man's thing because she was "looking somewhere else." He left the bedroom when he was finished, and the victim's mother and stepfather saw him leave the room. The victim's stepfather asked the Appellant what he was doing, but the Appellant did not answer. The victim's mother took the victim into the bathroom and asked what happened, and the victim told her mother that "my uncle was touching me." Onry asked the victim how she knew the Appellant was "drunk," and the victim said he had been drinking "cerveza." She said she was seven years old when the incident occurred, that no one had ever touched her prior to the incident, and that her aunt took her to the doctor while her mother was in the hospital with her baby brother.

On cross-examination, Onry acknowledged that the victim did not cry during the interview. On redirect examination, Onry testified that at the beginning of the interview, the victim "seemed bright" and "talked about her family and things that they did." However, as Onry and the victim "got into the abuse scenario of the interview," the victim's demeanor changed. She became soft-spoken, "was a little bit more fidgety," and "seemed sad."

The victim testified that she was born in May 2005, that she was eleven years old, and that she was in the sixth grade. She stated that in January 2013, she lived with her mother, stepfather, and two brothers in a house on Toehill Cove. The victim's older brother had his own bedroom, the victim had her own bedroom with a bunk bed, and the victim's younger brother slept with her parents. At some point, the Appellant came to live with them, so the victim's older brother moved into the victim's room and slept on the top bunk while the victim slept on the bottom bunk. The Appellant slept in her brother's bedroom.

The victim testified that one night, her stepfather's friends were at the house "drinking." The victim's mother also was there but had to leave about 9:00 p.m. to go to work. The three children went to bed with the victim sleeping on the bottom bunk in her

- 4 -

bedroom and her two brothers sleeping in her parents' bedroom. The victim was wearing pink shorts and a shirt.

The victim testified that about midnight, she awoke to the Appellant's touching her "private part" while she was lying in bed. He moved her onto the floor, pulled down her shorts, and "put his middle part . . . on [her] private." She said she did not remember if his middle part went inside her private part. She said he also put his mouth on her private part while she was on the bed and on the floor. The victim said that she heard the front door open, that she knew her parents were returning home, and that she got up and ran out of the room. She went into the bathroom, and her mother followed her. The victim's mother asked the victim what happened, and the victim told her mother that the Appellant touched her. She said she did not tell her mother everything the Appellant did because she was scared. After the victim left the bathroom, she saw her stepfather talking with the Appellant. The victim slept in her mother's room that night.

The victim testified that the next day, her younger brother swallowed a penny and had to go to the hospital. The victim's mother went to the hospital with him, so the victim's aunt was at the victim's house when the victim got home from school. While the victim and her aunt were in her aunt's car, the victim's aunt brought up the incident between the Appellant and the victim, and the victim told her what happened. The victim went to a doctor and had an examination. She also talked with Teresa Onry about the incident.

On cross-examination, the victim testified that the Appellant and her mother also had been drinking alcohol that night. The victim acknowledged that when she awoke, the Appellant was touching her private part with his mouth. She said she did not remember if her shorts were down at that time but that they were down at some point while she was on the bed and by the time the Appellant moved her onto the floor. The victim said that during the incident, she heard the door of the house open and thought her parents were home. She ran from her bedroom to the bathroom, and the Appellant called her name and also ran out of the room. On her way to the bathroom, the victim saw her parents in the hallway. Her mother came into the bathroom and was worried about her. The victim told the jury that she "was scared, so [she] didn't know how to explain it" to her mother. Regarding the time of the incident, the victim said, "I just remember -- because my mom usually got out of work at three. So, like, it was, like, either two or three or maybe almost four."

The victim testified that she went to school the next day. When she got home from school, her aunt was waiting for her in her aunt's car. They talked in the car, and the victim's aunt asked her a lot of questions. The victim told her aunt more than she told her mother, and she and her aunt went to her aunt's house. That night after the victim

- 5 -

went to bed, the police came to her aunt's house and took the victim to the Rape Crisis Center. The victim acknowledged watching her interview with Teresa Onry before trial. She said she did not remember telling anyone that she was watching television in her mother's bedroom when the Appellant touched her.

Judy Pinson testified as an expert in sexual assault examination that she used to be a nurse examiner at the Rape Crisis Center and that she performed an examination on the victim on January 8, 2013, about two and one-half days after the alleged abuse occurred. The victim's aunt was with her, but the victim's mother consented to the examination. Pinson read the following written summary from her report:

> [The victim] states she was in her mother's room watching TV when her uncle Felipe came in. He kissed her genital area and put her on the floor and touched her genital area with his man thing. She indicates her genital area by pointing. He did not remove her clothes but moved them. He stopped when her mother came home.

The State asked if Pinson gave the victim an opportunity to read and correct the summary, and Pinson answered, "No. Only if I ask -- only if I wasn't clear. If I wasn't clear, I may ask her to clarify, but no." Pinson stated that the victim "readily and quietly" answered her questions and that the victim "seemed embarrassed when answering questions about being abused."

Pinson testified that her examination revealed redness on both sides of the victim's labia. She said that the redness could have been caused by abuse but that "[a]nything can cause [redness]. There may be -- it may just be that way. It could be from somebody -- a child not cleaning well enough after urinating or irritation from clothes or anything." During the examination, Pinson did not collect evidence for a rape kit because the victim told her "that it was kissing and touching." Therefore, "the likelihood of finding anything by a lab at that point was probably not very great." Pinson stated that the absence of any significant injury to the victim was not unusual because "[i]n children, there is, most often, no injuries."

On cross-examination, Pinson testified that she examined the victim at 2:30 p.m. and that the victim did not report any pain, was cooperative, and did not cry. Pinson examined the victim's external genitalia but not her vagina, and Pinson did not see any injuries such as cuts or tears. She acknowledged that the redness she observed did not mean a sexual assault occurred. The victim told Pinson that the Appellant touched her with his man's thing. Pinson did not ask the victim if the Appellant touched her on the outside or the inside.

Sergeant Anthony Lee of the Memphis Police Department (MPD) testified that he was the lead investigator for this case and that he reviewed Judy Pinson's Rape Crisis Center report and watched the victim's January 28 interview with Teresa Onry via a closed circuit camera. Sergeant Lee decided to talk with the Appellant. The Appellant did not speak English, so Sergeant Lee had a Spanish-speaking investigator contact the Appellant and schedule an appointment for the Appellant at the police department. However, the Appellant did not show up for the appointment. Sergeant Lee told the investigator to find the Appellant and "have him brought in." The investigator learned the Appellant's whereabouts via a text message, and police officers brought him to the police department on February 25, 2013. Sergeant Lee spoke with the Appellant that afternoon, and Detective Fausto Frias translated. Sergeant Lee filled out a Spanish Advice of Rights form for the Appellant, and Sergeant Lee and the Appellant signed the form. Sergeant Lee then interviewed the Appellant. Sergeant Lee asked the questions, and Detective Frias translated the questions for the Appellant.

On cross-examination, Sergeant Lee testified that he did not charge the Appellant with a crime after the victim's January 28 interview because "I hadn't talked to him at that time." The Appellant was supposed to come to the police department at 9:00 a.m. on February 11. When the Appellant did not show up for the appointment, Sergeant Lee had the Appellant arrested. Sergeant Lee interviewed the Appellant but did not record the interview. He acknowledged that he had interviewed the victim's mother and aunt and that he recorded those interviews. He said he did not record the Appellant's interview because "[a]t that particular time, we were not recording suspect statements on audio recording. We do now; we did not then." The Appellant began giving his statement at 1:15 p.m., and the statement ended at 3:40 p.m.

Sergeant Lee testified that after the Appellant's interview, he prepared an affidavit of complaint, charging the Appellant with rape of a child and aggravated sexual battery. He acknowledged that in the complaint, he alleged that the Appellant went into the victim's bedroom, "grabbed" her, and "dragged" her out of bed.

Detective Fausto Frias testified that he originally was from the Dominican Republic, that his native language was Spanish but that he also was fluent in English, and that he worked as a translator and a detective for the MPD. In February 2013, Detective Frias participated in Sergeant Lee's interview of the Appellant. The Appellant was from Central America, either Honduras or Mexico, and Detective Frias spoke with him in Spanish. Detective Frias stated that "each country has a separate dialect of Spanish" but that "at one point it becomes universal Spanish." There were no dialect issues between Detective Frias and the Appellant, and they understood each other.

Detective Frias testified that the Appellant was calm and alert and that he first talked with the Appellant about the Appellant's upbringing, education, work, and family. He then read a Spanish Advice of Rights form to the Appellant. Detective Frias read each of the Appellant's rights to him, had the Appellant explain what each right meant, and had the Appellant initial each right. The Appellant never asked for an attorney, so Detective Frias began interviewing him about the incident with the victim. Detective Frias said, "Sergeant Lee was the one asking the question[s]. I was translating." Detective Frias then translated the Appellant's answers to Sergeant Lee.

Detective Frias testified that the Appellant initially "denied all involvement." However, when Sergeant Lee confronted the Appellant with the victim's allegations, the Appellant "began to talk a little bit more and he . . . basically said well, I remember going into her room, I remember coming out of her room, but I don't remember what happened [in between]." The Appellant claimed he went into the victim's bedroom to wake the victim in order to get a telephone number from her. Detective Frias asked the Appellant if he would give a DNA sample, and Detective Frias read a Spanish DNA Sample Release form to him. The Appellant signed the form, and Sergeant Lee collected a buccal swab from him. Detective Frias advised the Appellant that "we have your DNA now and it's going to be compared to any evidence and any DNA that's been collected on the scene." At that point, the Appellant "became emotional" and yelled out in Spanish, "'This is real shameful and embarrassing.'" Detective Frias stated as follows:

> His eyes became real watery and I told him hey, once you let it out, you're going to feel much better. And he took a couple of deep breaths and he told me yes, I did. He said I went into -- I went into her room and pulled down her panties. I kissed her vagina, put her on the floor, and I stuck the tip of my penis in her. And then I started feeling bad and I ran back into the room where I was confronted -- where he was confronted by the mother.

Detective Frias testified that after the Appellant gave his oral statement, "we began a typed statement." The State had Detective Frias read the typed statement to the jury and introduced the statement into evidence. The typed statement provided, in pertinent part, as follows:

> Q:    Did anything unusual happen at . . . Toe Hill Cove on January 06, 2013 at approximately 3:30AM between you and [the victim]?

A:      I had been drinking.  I had about 20 Corona's and went to sleep.  After waking up I went to use the restroom and I walked into [the victim's] room.  I grabbed her and woke her up and pulled her panties down and kissed her bulva.  I put the head of my pene in her bulva.  (head of my penis in her vagina)  I began feeling bad for what I was doing and got up.  That's when her parents came home.  The whole incident lasted about three minutes.

. . . .

Q:      Did you make [the victim] take off her shorts and panties?

A:      I took them off.

Q:      What room was [the victim] in . . . ?

A:      Her room[.]

Q:      Did you move [the victim] from the bed to the floor?

A:      I grabbed her and pulled her to the floor.  I kissed her bulva and put the head of my pene in her bulva.

Q:      Did you put your mouth on [the victim's] vagina (bulva)?

A:      I pulled her pants down and kissed her bulva.

Q:      Did you put your pene inside [the victim's] bulva?

A:      Yes[.]

Q:      How were your clothes when you went in [the victim's] bedroom and put your pene in her bulva . . . ?

A:      I had on sweat pants and just pulled them down a little bit to pull my pene out.

Detective Frias asked the Appellant the word for a male's penis, and the Appellant answered, "[P]ene." He asked the Appellant the word for a female's vagina, and the Appellant answered, "Bulva." Detective Frias asked the Appellant why he kissed the victim's vagina and put his penis in her vagina, and the Appellant answered, "Because I was drunk." The officer asked the Appellant if he was sexually aroused during the incident, and the Appellant said, "I never got a hard on because I was too drunk."

On cross-examination, defense counsel asked Detective Frias if his "rank" was "technically, still patrolman." Detective Frias answered, "Detective is the title we use, but my rank is still actually patrolman. Yes." Detective Frias graduated from Columbia College in Missouri and attended some community college classes in Texas. He acknowledged that he was not a certified interpreter and that he had never been to Honduras. He also acknowledged that some words in Honduras were different than some words in the Dominican Republic.

Detective Frias testified that the Appellant was interviewed in a windowless interview room, that the Appellant was sitting on a bench, and that the Appellant's leg was handcuffed to the bench. The Appellant may have been sitting on the bench for more than one hour before Detective Frias entered the room. The Appellant did not speak any English, could not read Spanish, and had no education. Therefore, Detective Frias read everything to him. Detective Frias acknowledged that in his supplement to the Appellant's interview, he wrote that the Appellant read the <u>Miranda</u> rights, which was incorrect because the Appellant could not read. During the interview, Sergeant Lee asked the questions in English, and Detective Frias translated the questions into Spanish for the Appellant. Detective Frias then translated the Appellant's Spanish answers into English for Sergeant Lee. Sergeant Lee typed the Appellant's statement and inserted some words in parentheses. The words in parentheses were Sergeant Lee's words, not the Appellant's words. Detective Frias acknowledged that he had no record of his Spanish questions to the Appellant or the Appellant's Spanish answers. He also acknowledged that the Appellant's typed statement did not include everything Detective Frias claimed the Appellant said.

At the conclusion of Detective Frias's testimony, the State rested its case and made an election of offenses as to count one, rape of a child. The State chose to base the offense on the Appellant's penetrating the victim's vagina with his penis as opposed to his putting his mouth on her vagina. During the State's closing argument, the prosecutor argued that the Appellant committed aggravated sexual battery by placing his mouth on her vagina. The jury convicted the Appellant as charged of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced the Appellant as a Range I, standard offender to consecutive

sentences of forty and ten years, respectively, for a total effective sentence of fifty years, to be served at 100%.

## II.  Analysis

### A.  Motion to Suppress

The Appellant contends that the trial court erred by failing to suppress his statement to police.  The State argues that the trial court properly denied the Appellant's motion to suppress.  We agree with the State.

Before trial, the Appellant filed a motion to suppress his statement because (1) the police lacked probable cause for his warrantless arrest; (2) the police unnecessarily delayed a probable cause determination by failing to bring him promptly before a neutral magistrate after his warrantless arrest; (3) he did not knowingly, intelligently, and voluntarily waive his Miranda rights; and (4) the police "extracted" his statement from him in violation of due process.  At the April 29, 2016 suppression hearing, Sergeant Lee testified that he was assigned to investigate this case and went to the Rape Crisis Center on January 8, 2013, to speak with the victim.  The victim was at the Center with her aunt, and a forensic examination could not be performed on the victim at that time because the victim's mother was not present.  On January 28, 2013, Sergeant Lee observed the victim's forensic interview at the CAC.  During the interview, the victim said the Appellant pulled down her pants, kissed her vagina, and touched her vagina.  Sergeant Lee acknowledged that the victim also said the Appellant put "his man thing in her girl thing."  After the interview, Sergeant Lee and a Spanish-speaking officer interviewed the victim's mother.

Sergeant Lee testified that after the victim's mother's interview, he had the Spanish-speaking officer contact the Appellant and arrange for the Appellant to come to the police department to talk with Sergeant Lee.  The Appellant did not show up for the appointment.  On the morning of February 25, police officers arrested the Appellant and transported him to the police department.

Sergeant Lee testified that he and Detective Fausto Frias began interviewing the Appellant about 1:00 p.m.  Detective Frias advised the Appellant of his rights by reading him a Spanish Advice of Rights form, and the Appellant waived his rights.  Sergeant Lee asked the questions during the interview, and Detective Frias translated the questions into Spanish for the Appellant.  Detective Frias then translated the Appellant's answers from Spanish into English for Sergeant Lee, and Sergeant Lee typed the answers in English.  Initially, the Appellant was calm during the interview.  However, after one of the questions, the Appellant "stopped, bowed his head down, . . . looked at the ground, and

started crying." After the interview, Detective Frias read the Appellant's typed statement back to him "to ensure everything was correct just as he had given to us" and had the Appellant sign the statement. Sergeant Lee also signed it.

Sergeant Lee testified that he did not threaten or promise the Appellant anything during the interview. The Appellant was not free to leave, and his ankle was handcuffed to the bench he was sitting on in the interview room. After the interview, Sergeant Lee "called for the AG that works with our office to get the charge approved of rape of a child." After the approval, Sergeant Lee prepared an arrest warrant and an affidavit of complaint. A judicial commissioner signed the arrest warrant, and the Appellant was "booked" into jail.

On cross-examination, Sergeant Lee testified that he was not present when the victim spoke with someone at the Rape Crisis Center but that he received Judy Pinson's report. He acknowledged that according to the report, the victim said the Appellant touched her while she was watching television in her mother's bedroom. However, the victim told Teresa Onry at the CAC on January 28 that the Appellant touched her while she was in her bed. Sergeant Lee acknowledged that he did not "go out and arrest" the Appellant for a crime after the victim's CAC interview. Instead, he had the Spanish-speaking officer contact the Appellant and schedule an appointment for the Appellant at the police department. Sergeant Lee said the purpose of the appointment was so that the Appellant could "come in and talk, give us his side of the story. . . . Why would you -- why would you do anything with one side of the story?" However, when the Appellant did not show up for the appointment, Sergeant Lee had the Appellant "picked up" on February 25, 2013.

Sergeant Lee acknowledged that the Appellant was under arrest when the police brought the Appellant to the police department and that he did not obtain a warrant for the Appellant's arrest. He said he had probable cause to arrest the Appellant for rape of a child and aggravated sexual battery. Defense counsel asked why Sergeant Lee did not charge the Appellant with the crimes immediately after the arrest, and Sergeant Lee said he wanted "to get [the Appellant's] side of the story, to get his statement from him."

Sergeant Lee testified that after the Appellant's interview, he contacted the prosecutor to get the prosecutor's "approval" for the charges. He then prepared the affidavit of complaint, which included an arrest warrant. A judicial commissioner determined there was probable cause to charge the Appellant with the crimes. The Appellant was not present when the judicial commissioner determined probable cause.

On redirect examination, Sergeant Lee acknowledged that the victim told Pinson at the Rape Crisis Center and Onry at the CAC that the Appellant kissed her genital area

- 12 -

and put his man's thing on her girl's thing. Sergeant Lee said he could have charged the Appellant with rape of a child and aggravated sexual battery without the Appellant's statement. He acknowledged that he did not have to have a confession from a defendant in order to charge a defendant with a crime. In this case, Sergeant Lee had probable cause to arrest the Appellant before he gave his statement. On recross-examination, Sergeant Lee acknowledged that the victim's statements at the Rape Crisis Center and the CAC were inconsistent in that the victim said in the former that the abuse occurred while she was watching television in her mother's bedroom but said in the latter that the abuse occurred while she was sleeping in her bed.

Detective Fausto Frias testified that on February 25, 2013, he assisted Sergeant Lee with the Appellant's interview. Detective Frias was born in Venezuela, was raised in the Dominican Republic, and his first language was Spanish. He acknowledged that his Spanish was comparable to the Appellant's Spanish and that the Appellant did not have any trouble understanding him.

Detective Frias testified that he asked the Appellant for background information such as the Appellant's name, date of birth, and address and that the Appellant provided the information. The Appellant told Detective Frias that he did not go to school and that he had "a problem" reading. Therefore, Detective Frias read the Appellant's Miranda rights to him in Spanish. Detective Frias and the Appellant went over each line of a Spanish Advice of Rights form together, and the Appellant told him what he understood each line to mean. The Appellant initialed each line and printed his name at the bottom of the form. Detective Frias asked the Appellant if he was under the influence of any drugs or alcohol, and the Appellant said he was "fine." Detective Frias asked the Appellant if he knew why he was at the police department, and the Appellant said he had been accused of raping the victim.

Detective Frias testified that during the interview, Sergeant Lee asked the questions in English, and Detective Frias translated them into Spanish for the Appellant. Detective Frias then translated the Appellant's answers into English for Sergeant Lee. Initially, the Appellant was calm and claimed he went into the victim's bedroom to ask her about a telephone number. The Appellant remembered what happened before and after he went into the bedroom but did not remember what happened while he was in the room. Detective Frias said that when he confronted the Appellant with that fact, the Appellant "got nervous, and it [was] obvious that he was not being truthful." Detective Frias again asked the Appellant what happened in the bedroom, and the Appellant "came forward." Detective Frias said,

> He said he was embarrassed to tell me what happened. He
> said that he was really apologetic about what took place. He

said he kissed her vagina and pulled her panties down and
kissed her vagina and stuck his penis -- the tip of his penis in
it.  Then he started feeling bad about the whole situation, and
he quickly got up and went back to his room.

The Appellant said he had consumed about twenty Corona beers on the day of the
incident.  The Appellant was very upset and emotional, and he agreed to give a DNA
sample.

Detective Frias testified that Sergeant Lee typed the questions and answers for the
Appellant's statement in English.  After Sergeant Lee finished typing the statement,
Detective Frias reviewed it with the Appellant by reading it to him in Spanish.  The
Appellant could have made corrections to his answers, but he did not make any
corrections.  The Appellant initialed each page of the four-page statement, signed it, and
dated it.

On cross-examination, Detective Frias testified that had no training or certification
as a Spanish interpreter and had never been to Honduras.  He acknowledged that different
dialects of Spanish were spoken in different countries.  He said, though, that "when I
talked with Mr. Gonzales, I was able to communicate with . . . it's like a catchall Spanish.
. . . You're going to have some things that might be different, but the Spanish
conversation, you're able to talk to someone that speaks Spanish."  Detective Frias said
he knew the Appellant understood him.

Detective Frias testified that the Appellant did not speak any English, did not go to
school, and did not know how to read or write.  Detective Frias asked the Appellant if he
had any mental illnesses or took any medications, and the Appellant said no.  Detective
Frias asked the Appellant for his address, but the Appellant could only tell Detective
Frias that he lived at "Macon and Homer"; the Appellant did not know his street address.
Detective Frias made no record of the Spanish questions he asked the Appellant or the
Appellant's Spanish answers.  Detective Frias acknowledged that the Appellant signed a
Spanish Advice of Rights form, his statement, and a Spanish DNA Sample Release form
and that the Appellant spelled his name differently on all three forms.  He also
acknowledged that while Sergeant Lee was typing the Appellant's statement, Sergeant
Lee put some words in parentheses, using his own interpretation of what the Appellant
said.  After Sergeant Lee typed the statement, Detective Frias read the statement to the
Appellant by translating it from English into Spanish.

Upon being questioned by the trial court, Detective Frias testified that the
Appellant was not under the influence of an intoxicant during the interview.  The trial
court asked Detective Frias what he would have done if the Appellant had been under the

- 14 -

influence, and Detective Frias said he would not have interviewed the Appellant. Detective Frias said he did not know if Sergeant Lee gave the Appellant anything to eat or drink before Detective Frias entered the interview room. Detective Frias then stated, "But when I enter the interview room, I always, as part of my introduction, I offer them water, some chips, or something to drink, or if they want to use the restroom." The trial court had Detective Frias read each line of the Spanish Advice of Rights form aloud in Spanish and English. Detective Frias stated that the Appellant never asked for an attorney or said he did not want to talk to the police. Had the Appellant done so, Detective Frias would have stopped the interview. When the Appellant finished giving his statement, Sergeant Lee printed it. Detective Frias and the Appellant reviewed the statement together, and the Appellant did not make any changes to it.

At the conclusion of the suppression hearing, the trial court said it was going to continue the hearing until May 20, 2016. The court advised the parties that it would hear their arguments and rule on the motion to suppress at that time. The record reflects that the hearing actually was continued until September 1, 2016. At the September hearing, the parties chose not to make any arguments regarding the motion, and the trial court orally denied the motion. The court found that the Appellant was under arrest when he gave his statement but that Sergeant Lee had probable cause for the warrantless arrest based upon the victim's claim that the Appellant "'put his man thing on my girl thing.'" Regarding any delay in taking the Appellant before a judicial magistrate, the trial court stated that the Appellant was arrested, charged, and "taken to a magistrate as soon as the charges were filed against Mr. Gonzales" and found that there was no "extraordinary" delay in the magistrate's probable cause determination. The trial court did not make any findings or rulings with regard to the Appellant's claims that he did not give his statement knowingly, intelligently, or voluntarily or that the police took his statement in violation of his due process rights.

1. Probable Cause

First, the Appellant contends that the trial court erred by denying his motion to suppress his statement because the police arrested him without probable cause. In support of his argument, he claims that the only evidence against him at the time of his arrest was the victim's conflicting statements to Judy Pinson at the Rape Crisis Center and Teresa Onry at the CAC. The State argues that the trial court properly found probable cause for the Appellant's arrest. We agree with the State.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings

of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id.  Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo.  See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).  Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Odom, 928 S.W.2d at 23.  We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial."  State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures."  In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression.  State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009).  However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed.  State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998).  Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification."  State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted).  The parties do not dispute that a full-scale arrest is at issue in this case.

> Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense."

State v. Bridges, 963 S.W.2d 487 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Turning to the instant case, Sergeant Lee testified that he went to the Rape Crisis Center to speak with the victim soon after the alleged crimes, that he interviewed her mother, that he reviewed Pinson's report, and that he observed the victim's interview with Onry.  Although the victim told Pinson that the abuse occurred in her mother's bedroom and Onry that the abuse occurred in her own bedroom, the victim consistently told both women that the Appellant kissed her vagina and that he put his penis on her

- 16 -

vagina. She also told both women that he moved her from the bed onto the floor and that her mother came home during the abuse. Therefore, we agree with the trial court that Sergeant Lee had probable cause to arrest the Appellant.

2. Unnecessary Delay in Presenting to a Magistrate

The Appellant contends that the trial court erred by denying his motion to suppress his statement because Sergeant Lee obtained it in violation of his Fourth Amendment right to a prompt determination of probable cause. Specifically, he argues that Sergeant Lee obtained his statement prior to the magistrate's determination of probable cause in order to gather additional proof against him. He also argues that there is no evidence he ever appeared before a neutral and detached magistrate after his arrest. The State claims that the Appellant is not entitled to relief because Sergeant Lee presented an affidavit of complaint to a judicial commissioner within five and one-half hours of his arrest, well within the forty-eight hours required by law, and that the Appellant was not required to be present at the probable cause determination. We agree with the State.

"When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to 'seek a prompt judicial determination of probable cause.'" State v. Bishop, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting Gerstein v. Pugh, 420 U.S. 103, 125 (1975)). In the event of a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). In Tennessee, these hearings are often referred to as "'Gerstein hearings.'" Bishop, 431 S.W.3d at 42.

A delay of less than forty-eight hours is presumptively reasonable. Id. However, a delay of forty-eight hours "may still be considered unreasonable, and hence unconstitutional, if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" Id. (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). As our supreme court has explained,

> [W]hen a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it "ripens" into a Gerstein violation. . . . "[I]f the [arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed."

Id. (citing and quoting State v. Huddleston, 924 S.W.2d 666, 675 (Tenn. 1996)).

The record reflects that the police arrested the Appellant at 11:00 a.m. on February 25, 2013. They transported him to the police department, Detective Frias advised him of his rights from a Spanish Advice of Rights form at 1:15 p.m., and the Appellant signed the form at 1:20 p.m. The Appellant gave his typed statement at 2:10 p.m., and he and the officers signed his statement at 3:40 p.m. While the Appellant was being "booked" into jail, Sergeant Lee presented an affidavit of complaint and accompanying arrest warrant to a judicial commissioner. The judicial commissioner signed the affidavit of complaint and the warrant, and the general sessions court clerk date-stamped the documents at 4:30 p.m., just five and one-half hours after the Appellant's arrest and well-within the required forty-eight-hour time frame. Therefore, the delay in bringing the Appellant before the magistrate was presumptively reasonable and was unreasonable only if the delay was for the purpose of gathering additional evidence to justify the Appellant's arrest, was motivated by ill will, or was delay for delay's sake. We have already determined that the Sergeant Lee had probable cause to arrest the Appellant. Although Sergeant Lee interviewed the Appellant prior to the judicial commissioner's determining probable cause, Sergeant Lee did so to get the Appellant's version of the events, not to gather additional evidence to justify the arrest. Moreover, nothing indicates that the delay was motivated by ill will or delay for delay's sake. Therefore, the Appellant is not entitled to relief.

In a related argument, the Appellant claims that there was no evidence he ever appeared before a neutral and detached magistrate after his arrest, which also violated the Fourth Amendment under <u>Gerstein</u>. This court has addressed the issue of a defendant's failure to appear before the magistrate at the probable cause determination and noted that "the only issue to determine [in a <u>Gerstein</u> hearing] is whether 'there is probable cause for detaining the arrested person pending further proceedings,' which 'can be determined reliably without an adversary hearing.'" <u>State v. Marvin Johnson</u>, No. W2015-00783-CCA-R3-CD, 2016 WL 2609712, at \*17 (Tenn. Crim. App. at Jackson, May 4, 2016) (quoting <u>Gerstein</u>, 420 U.S. at 420), <u>perm. app. denied</u>, (Tenn. Sept. 26, 2016). This court then found the following reasoning persuasive:

> "The post-arrest <u>Gerstein v. Pugh</u> hearing is required to fulfill the same function for suspects arrested without warrants as the pre-arrest probable cause hearing fulfills for suspects arrested with warrants. One who has had an arrest warrant issued before this arrest has had no opportunity to appear physically before the issuing magistrate during the probable cause determination. There is likewise no reason to require such an appearance at the post-arrest probable cause determination."

- 18 -

Id. (quoting King v. Jones, 824 F.2d 324, 327 (4th Cir. 1987)).  Accordingly, this court concluded that a defendant's presence at a probable cause determination was not required to satisfy Gerstein.  Id.  We likewise agree with the reasoning in King.  Thus, the Appellant is not entitled to relief.

3.  Knowing, Intelligent, and Voluntary Waiver

The Appellant contends that the trial court erred by denying his motion to suppress his confession because he did not knowingly, voluntarily, and intelligently waive his Miranda rights.  In support of his argument, he notes that he spoke only Spanish, that he had no education, that he spelled his name differently on the three documents he signed, that nothing indicates he had any understanding of the criminal justice system in this country, that no recording was made of his explaining his rights to Detective Frias in his own words, and that Detective Frias had no formal training in translating Spanish.  We disagree with the Appellant.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a statement taken during custodial interrogation.  State v. Northern, 262 S.W.3d 741, 763 (Tenn. 2008).  In order for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'"  State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).  In other words, "the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion."  State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013).

If, prior to making a statement, the accused is advised of his Miranda rights and then knowingly and voluntarily waives those rights, the statement is admissible against the accused.  State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998) (citing Miranda v. Arizona, 384 U.S. 436, 444-59 (1966)).  Our supreme court has held that "the State need only prove waiver [of Miranda rights] by a preponderance of the evidence.  In determining whether the State has satisfied that burden of proof, courts must look to the totality of the circumstances."  State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997) (citation omitted).  In the course of our examination, we consider the following factors in determining the voluntariness of a confession:  the defendant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the defendant before the

magistrate prior to the confession; the defendant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Proof that an accused was made aware of his Miranda rights, although not conclusive, weighs in favor of the admission of a confession into evidence. See Carter, 16 S.W.3d at 767.

Here, the trial court forgot to address this issue when it was ruling on the Appellant's motion to suppress. It was defense counsel's responsibility to pursue a ruling from the court in order to preserve the issue for our review. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Waiver notwithstanding, we may review an issue for plain error "[w]hen necessary to do substantial justice." Tenn. R. App. P. 36(b). We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The record reflects that the Appellant was thirty-nine years old when he gave his statement. He had no education, he could not read or write, and nothing in the record suggests he had previous experience with the police. However, the record does not demonstrate that the nature of the interrogation was repeated or prolonged; the Appellant had been detained just two to three hours when he gave his confession. Although the Appellant was illiterate and could not speak English, Detective Frias read a Spanish Advice of Rights form to him and had him explain the rights in his own words. Detective Frias also had the Appellant initial each right. The judicial determination of probable cause was not unnecessarily delayed because an arrest warrant was issued just five and one-half hours after the Appellant was arrested. Detective Frias testified that the Appellant did not appear to be under the influence of drugs or alcohol and that the

Appellant said he was "fine." Although Detective Frias did not know if Sergeant Lee gave the Appellant anything to eat prior to Detective Frias's entering the interview room, Detective Frias said it was his own practice to offer food, drink, and a bathroom break to suspects. The Appellant was arrested at 11:00 a.m. and interviewed at 1:00 p.m., and nothing indicates that he had been deprived of sleep or medical attention. Sergeant Lee testified at trial that he did not threaten the Appellant or promise him anything during the interview. We note that the Appellant did not testify at the suppression hearing regarding his lack of understanding his rights or any alleged coercive activity by the police officers. Therefore, under the totality of the circumstances, we conclude that the Appellant has failed to demonstrate that he did not knowingly, intelligently, and voluntarily waive his <u>Miranda</u> rights.

## 4. Due Process

Finally, the Appellant contends that the trial court erred by failing to grant his motion to suppress on due process grounds. However, the Appellant also did not request a ruling from the trial court on this issue. <u>See</u> Tenn. R. App. P. 36(a). In any event, for the reasons explained in the sections above, we find no due process violation.

## B. Bias

The Appellant contends that the trial court erred by refusing to allow him to question the victim's mother and aunt about bias created by the mother's potential eligibility for a "U visa." The State argues that the trial court properly refused to allow the Appellant to question the witnesses. We conclude that the trial court erred but that the error was harmless.

Before the victim's mother testified, the State requested that the trial court prohibit the defense from asking the witnesses about their "legal or illegal immigration status." Defense counsel advised the trial court that the defense's theory was that the victim's mother and aunt had coached the victim to accuse the Appellant falsely so that one or both of them could obtain legal status in the United States. Therefore, their immigration status was relevant. In support of counsel's argument, she advised the trial court that the victim's mother had applied for a U Visa, which granted legal status to a person not in the country legally, and argued that obtaining a U visa was "powerful motivation" to lie against the Appellant. Counsel requested that she be allowed to question the victim's mother and the victim's aunt about possible bias related to a U visa. The trial court held that the evidence was not relevant and, even if somehow relevant, that "it would be allowing the jury to guess and speculate, return a verdict on an emotional basis." However, the court allowed defense counsel to make an offer of proof.

In a jury-out hearing, the victim's mother testified that in January 2013, she was in the United States illegally. After the victim went to the Rape Crisis Center, the victim's mother applied for a U visa. Defense counsel asked her "what a U Visa is," and she answered, "[It] is for people that they have been victims of a crime." An attorney helped the victim's mother apply for a U visa, and she had to submit a copy of the victim's records from the Rape Crisis Center with the application. She said she had not yet received a U visa but that she was expecting to receive it. On cross-examination, the victim's mother testified that she hired an immigration attorney when she first came to the United States seven years before the Appellant's trial. On the day she was at the hospital with her youngest son, she was supposed to meet with her attorney. She spoke with him on the telephone and told him that she could not meet with him because her son was in the hospital and because there were "some issues" with the victim. The attorney told her to tell him what happened to the victim, so she told him about the victim and the Appellant. Her attorney then told her about a U visa. Upon being questioned by the trial court, the victim's mother testified that prior to applying for a U visa, she and her immigration attorney had been seeking political asylum for her in the United States. However, after the victim's allegations, her attorney told her, "[L]et's put aside the issue with the political asylum and let's then work on the U visa."

The victim's aunt testified that in January 2013, she was in this country illegally but was not working with an immigration attorney and did not know about a U visa. She said she learned about a U visa from the victim's mother "[w]hen this situation happened." At that time, the victim's aunt was dating a United States law enforcement officer. She later married him, and they were still married at the time of the Appellant's trial. Upon being questioned by the trial court, the victim's aunt testified that she obtained legal resident status through her marriage.

At the conclusion of the victim's aunt's testimony, defense counsel argued that she should be allowed to question the victim's mother and aunt about their knowledge of a U visa to show bias against the Appellant. The trial court ruled that the evidence was not relevant to any issue at trial because the witnesses testified that they did not know about a U visa prior to the victim's allegations. The Appellant contends that the trial court erred because the evidence was relevant to the witnesses' bias against him.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 616 provides that a party "may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Witness credibility is always a relevant issue. State v. Jereco Tynes, No. W2010-02511-CCA-R3-CD, 2013 WL 1043202, at *11 (Tenn. Crim. App. at Jackson, Mar. 13, 2013). Moreover, "the issue of the credibility of witnesses involves bias or interests existing at the time that they testify, not just such motivations which predate the claimed offense." State v. Reid, 882 S.W.2d 423, 429 (Tenn. Crim. App. 1994). As noted by the Advisory Commission Comment to Tennessee Rule of Evidence 616, "Bias is an important ground for impeachment." "The right to explore or examine witnesses for bias is a fundamental right." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). Furthermore, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." Id. We will uphold the trial court's decision absent an abuse of discretion. Id.

In Romero-Perez v. Commonwealth, 492 S.W.3d 902, 906 (Ky. App. 2016), the Kentucky Court of Appeals explained U visas and their importance to illegal immigrants in the United States:

> A U-Visa enables victims of certain crimes, including domestic violence, to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity. See 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6). Once an individual has resided continuously in the United States for three years following the receipt of a U-Visa, she is eligible to apply for lawful permanent residency. See 8 U.S.C. § 1255(m) (2012). "An alien granted U-1 nonimmigrant status is employment authorized incident to status." 8 C.F.R. § 214.14(f)(7)(2013).
>
> In short, the U-Visa creates a pathway whereby an illegal immigrant may be able to obtain lawful permanent residency within three years. To obtain a U-Visa the applicant must: (1) "possess specific facts regarding the criminal activity leading a certifying official to determine that the petitioner has, is, or is likely to provide assistance to the investigation or prosecution of the qualifying criminal

- 23 -

activity," 8 C.F.R. § 214.14(b)(3), and (2) [demonstrate that she is] "being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based, and since the initiation of cooperation, has not refused or failed to provide information and assistance reasonably requested." 8 C.F.R. § 214.14(b)(3).

One can readily see how the U-Visa program's requirement of "helpfulness" and "assistance" by the victim to the prosecution could create an incentive to victims hoping to have their U-Visa's granted. Even if the victim did not outright fabricate the allegations against the defendant, the structure of the program could cause a victim to embellish her testimony in the hopes of being as "helpful" as possible to the prosecution. See Michael Kagan, Immigrant Victims, Immigrant Accusers, 48 U. Mich. J.L. Reform 915, 945 (2015) ("The U visa . . . gives witnesses a potentially powerful motive to make false or exaggerated reports.").

Regarding the prejudicial effect of such evidence, the Kentucky court stated,

[i]t is true that a witness' immigration status could trigger negative sentiments in the minds of some jurors. . . . [However,] [t]he value of [permanent resident] status for those living in immigration limbo cannot be overstated. The ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to the leave the United States, could provide a strong motive for fabrication or embellishment.

492 S.W.3d at 907.

Turning to the instant case, we agree with the Kentucky Court of Appeals that the victim's mother's U visa application was relevant to show possible bias against the Appellant. Moreover, although the victim's aunt did not apply for a U visa, we can see where a jury could infer from the victim's aunt's close relationship with the victim's mother, her twin, that she also could have been motivated to lie or exaggerate her claims against the Appellant in order to help the victim's mother. While the jury's hearing that the women were illegal immigrants could have been prejudicial, the Appellant's right to

effectively cross-examine the witnesses would not have been substantially outweighed by such prejudice. Accordingly, we have no hesitation in concluding that the trial court abused its discretion by not allowing defense counsel to cross-examine the witnesses about their possible bias.

We must now determine the effect of the error. A violation of a defendant's right to confrontation is a nonstructural constitutional error. State v. Gomez, 163 S.W.3d 632, 648 (Tenn. 2005), overruled on other grounds by State v. Gomez, 239 S.W.3d 733 (Tenn. 2007)). As such, the Appellant is "entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdicts." State v. Bell, 512 S.W.3d 167, 192 (Tenn. 2015). When determining whether the error was harmless beyond a reasonable doubt, we "'should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.'" State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008) (quoting State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002)). The burden is on the State to show that a nonstructural constitutional error is harmless. Brown, 311 S.W.3d at 434.

In the present case, the victim consistently told Judy Pinson at the Rape Crisis Center, soon after the abuse, and Teresa Onry at the CAC, almost three weeks later, that the Appellant moved her clothes but did not remove them, kissed her genital area, moved her onto the floor, and touched her genital area with his penis. Onry asked the victim if the Appellant's penis went inside her vagina, and the victim said inside. Both women testified that the victim's demeanor changed when they confronted her about the abuse, and Pinson found redness on both sides of the victim's labia, which could have resulted from abuse. The victim's testimony at trial was mostly consistent with what she told Pinson and Onry. Although the victim could not remember at trial if the Appellant's penis went inside her vagina, the Appellant gave a statement to the police in which he corroborated the victim's claim to Onry that his penis went inside the victim. Thus, we conclude that the trial court's error was harmless beyond a reasonable doubt.

## C. Criminal Attempt Instruction

The Appellant contends that the trial court erred by refusing to instruct the jury on attempted rape of a child as a lesser-included offense of rape of a child. The State concedes that the trial court erred but argues that the error was harmless. We agree with the State.

After the State presented its proof, defense counsel requested a jury instruction on attempt as a lesser-included offense of rape of a child because the victim told Teresa Onry that the Appellant "put his man's thing on my girl's thing" and testified at trial that

she did not remember whether the contact was inside or outside her. The State argued that the proof did not support attempt in that "[i]t's either inside or it's not." The trial court ruled that an attempt instruction was not appropriate in this case because there was no proof the Appellant did not complete the crime. The trial court advised defense counsel to request the instruction in writing in order to preserve the issue on appeal, and defense counsel did so.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). Furthermore, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." State v. Smith, 492 S.W.3d 224, (Tenn. 2016) (citing State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted).

Relevant to this issue, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" includes sexual intercourse, "however slight," of any part of the defendant's body into the genital opening of the victim's body, and emission of semen is not required. Tenn. Code. Ann. § 39-13-501(7). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Attempted rape of a child is a lesser-included offense of rape of a child. Tenn. Code Ann. § 40-18-110(f)(3). In charging a lesser-included offense, our Code explains:

When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

Tenn. Code Ann. § 40-18-110(a).

Our review of the testimony in this case shows that the victim told Judy Pinson that the Appellant "touched her genital area with his man thing" and that she told Onry that the Appellant "put his man's thing on her girl's thing." Although the victim also told Onry that the Appellant's man's thing went inside her girl's thing, the victim testified at trial that she could not remember if his "middle part" went inside her private part. Therefore, the record contains evidence in which reasonable minds could accept attempted rape of a child as a lesser-included offense, and the trial court erred by failing to instruct the jury on criminal attempt.

As to the effect of the error, a trial court's failure to provide a lesser-included offense instruction when required is a nonstructural constitutional error. See State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010) (stating that failure to instruct the jury as to a

lesser-included offense is a nonstructural constitutional error). As such, the State must prove beyond a reasonable doubt "that the error 'did not contribute to the verdict obtained.'" Climer, 400 S.W.3d at 556 (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

The victim's statements to Pinson and Onry were very consistent. For example, the victim told both women that the Appellant moved her clothes, kissed her genital area, and moved her from the bed onto the floor. The victim told Onry in her video-recorded interview that after the Appellant moved her onto the floor, he put his private part inside her private part. During a pretrial hearing regarding the admissibility of the video, the trial court described the victim as "very articulate" and found her account of the crimes in the interview to be trustworthy. The victim did not say at trial that the Appellant did not put his private part inside her private part. Instead, she said she could not remember if his private part went inside her private part. We note that more than three years had elapsed since the victim gave her statement to Onry and the victim testified at trial. Finally, the Appellant's statement to police was strikingly similar to the victim's statement to Onry. Specifically, the Appellant told the officers that he put his mouth on the victim's vagina, that he moved her from the bed onto the floor, and that he put the tip of his penis inside her vagina. Therefore, we again conclude that the trial court's error was harmless beyond a reasonable doubt.

## D. Double Jeopardy

The Appellant claims that his dual convictions violate double jeopardy because his conduct constituted a single, continuous sexual assault. The State argues that the convictions do not violate double jeopardy. We agree with the State.

"[T]he propriety of multiple convictions of sexual offenses arising from an allegedly single sexual assault must be analyzed under principles of double jeopardy as set forth by our supreme court in State v. Watkins, 362 S.W.3d 530 (Tenn. 2012)." State v. Itzol-Deleon, 537 S.W.3d 434, 441 (Tenn. 2017). The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See Watkins, 362 S.W.3d at 541. The instant case concerns the third category, protection against multiple punishments for the same offense in a single prosecution. "Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims." State v. Hogg, 448 S.W.3d 877, 885 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543). The instant case involves multiple description claims because the Appellant is asserting that his convictions for violating two different statutes, i.e., the statutes for rape of a child and

aggravated sexual battery, punish the same offense. See Itzol-Deleon, 537 S.W.3d at 441.

The "threshold inquiry" in multiple description claims is whether the dual convictions arose from the same act or transaction. Id. at 441-42. If so, a double jeopardy violation may exist. Id. In determining whether the convictions arose from the same act or transaction, our supreme court offered the following "non-exclusive" nine-factor list for consideration:

> 1. The nature of the defendant's actions that are alleged to be in violation of the various statutes ("the defendant's actions");
>
> 2. The temporal proximity between the defendant's actions;
>
> 3. The spatial proximity of the physical locations in which the defendant's actions took place;
>
> 4. Whether the defendant's actions contacted different intimate areas of the victim's body and the degree of proximity of those areas to each other;
>
> 5. Whether the defendant's contact with different intimate areas of the victim's body was deliberate or merely incidental to facilitating contact with another intimate area;
>
> 6. Whether the defendant deliberately used different parts of his body (or objects) to assault the victim sexually;
>
> 7. Whether the defendant's assault was interrupted by some event, giving him an opportunity to either cease his assault or re-form a subsequent intent to commit a subsequent assault;
>
> 8. Indications of the defendant's intent to commit one or more than one sexual assault on the victim; and
>
> 9. The extent to which any of the defendant's actions were merely ancillary to, prefatory to, or congruent with, any of his other actions, thereby indicating unitary conduct.

Id. at 450-51. "'Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness.'" Id. at 441 (quoting Watkins, 362 S.W.3d at 539).

Here, the proof showed that the Appellant went into the sleeping victim's bedroom and that the victim awoke in her bed to the Appellant's touching her genital area. The Appellant, who was on his knees on the floor, pulled down the victim's shorts and began kissing her vagina. He then pulled her onto the floor, pulled down his pants, and put the tip of his penis into her vagina. The victim, hearing her parents arrive home, jumped up and ran out of the room. Applying the Itzol-Deleon factors to the proof, the Appellant's kissing the victim's vagina and putting his penis into her vagina did not occur simultaneously and occurred with a change in physical position by both the Appellant and the victim. Both acts also involved the movement of clothing, first the victim's shorts in the bed and then the Appellant's pants while the victim was on the floor. The Appellant used two different parts of his body to contact one part of the victim's body. Finally, the Appellant's first kissing the victim's vagina in bed and then pulling her onto the floor so that he could penetrate her shows that the Appellant intended to commit two separate sexual assaults on the victim. Therefore, we conclude that the Appellant's convictions of rape of a child and aggravated sexual battery did not arise out of the same transaction and that no double jeopardy violation exists.

F. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because the only proof of penetration came from the victim, who gave "equivocal and outright contradictory testimony," and the "very questionable validity" of the Appellant's statement. He notes that neither the victim's mother nor the victim's aunt testified that the victim told them the Appellant penetrated her. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the

circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

As stated previously, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" includes sexual intercourse, "however slight," of any part of the defendant's body into the genital opening of the victim's body, and emission of semen is not required. Tenn. Code. Ann. § 39-13-501(7). Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-505(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

Taken in the light most favorable to the State, the evidence shows that the Appellant went into the victim's bedroom and began touching her genital area while she was sleeping in her bed. The Appellant, who was on the floor, pulled down the victim's pants and began kissing her vagina. He then moved her from the bed onto the floor, pulled down his sweatpants, and put the tip of his penis into her vagina. The abuse stopped when the victim's parents returned home. The victim's mother saw the Appellant coming out of the victim's bedroom and saw the victim run into the bathroom. She followed the victim and asked her what happened. The victim was scared, so she

- 31 -

told her mother only that the Appellant had touched her genital area. A day or two later, though, the victim told her aunt what happened. The victim's aunt contacted the victim's mother and the police, and the victim had a forensic examination at the Rape Crisis Center. The victim told Judy Pinson that the Appellant put his penis on her vagina, and Pinson found redness in the victim's genital area that could have been caused by such abuse. Almost three weeks later, Teresa Onry interviewed the victim at the CAC, and the victim told Onry that the Appellant kissed her vagina, moved her onto the floor, and put his penis into her vagina. The Appellant's statement to the police corroborated the victim's CAC interview. Although the victim told Pinson that the abuse occurred in her mother's bedroom while she was watching television, did not tell Pinson that the Appellant put his penis into her vagina, and testified at trial that she could not remember if the Appellant put his penis into her vagina, questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Accordingly, we conclude that the evidence is sufficient to support the convictions of rape of a child and aggravated sexual battery.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE